197-08/PJG
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Aracruz Trading Ltd.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900 / Facsimile: (212) 425-1901
Peter J. Gutowski (PG 2200)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ARACRUZ TRADING LTD.,                                    08 CIV. 3511 (JGK)

                            Plaintiff,                   ECF CASE

       -against-

JAPAUL OIL AND MARITIME SERVICES PLC,

                            Defendant.
-------------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................... i

PRELIMINARY STATEMENT ......................................................................... 1

RESPONSE ON THE FACTS ........................................................................... 1

POINT I

THIS COURT HAS SUBJECT MATTER JURISDICTION BECAUSE THE
SUIT ARISES FROM A COLLISION BETWEEN TWO VESSELS ........................................ 3

POINT II

THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT
BECAUSE THE RULE B ATTACHMENT SEIZED PROPERTY OF THE
DEFENDANT AND THUS THE COURT HAS *QUASI-IN-REM*
JURISDICTION OVER THE DEFENDANT TO THE EXTENT OF THAT
PROPERTY. ................................................................................................. 7

POINT III

DISMISSAL ON *FNC* GROUNDS IS NOT WARRANTED BECAUSE
DEFENDANT CANNOT PROVE NIGERIA IS AN ADEQUATE NEITHER
THE PUBLIC NOR PRIVATE INTEREST FACTORS TIP THE BALANCE IN
FAVOR OF LITIGATION IN NIGERIA ............................................................... 8

    A.    Applicable Legal Standard.................................................................. 9

        (i)    Deference to the Plaintiff's Choice of Forum ......................... 9

        (ii)    Nigeria is not an Adequate, Alternative Forum...................... 12

        (iii)    Public/Private Interest Analysis ............................................. 15

POINT IV

IN NO EVENT SHOULD THE FUNDS UNDER ATTACHMENT BE
RELEASED EVEN IF THE COURT WAS TO GRANT THE *FNC*
APPLICATION BECAUSE A RULE B ATTACHMENT SERVES IN AID OF
FOREIGN LITIGATION .................................................................................. 17

CONCLUSION................................................................................................ 19

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Afflerbach v. Cunard Line, Ltd.,*
  14 F. Supp. 2d 1260, 1263 n. 1 (D. Wyo. 1998)............................................................. 5

*Base Metal Trading Ltd. v. Russian Aluminum,*
  98 Fed. Appx. 47, 50 (2d. Cir. 2004) ....................................................................... 13

*BFI Group Divino Corp. v. JSC Russian Aluminum,*
  481 F. Supp. 2d 274, 284 ......................................................................................... 12, 13

*Concesionaria DHM v. International Finance Corporation,*
  307 F.Supp. 2d 553, 562 (S.D.N.Y. 2004)........................................................... 9, 10, 12

*Exter Shipping, Ltd. v. Kilakos,*
  310 F. Supp. 2d 1301 (N.D. Ga. 2004) .......................................................................... 5

*Guidi v. Inter-Continental Hotels Corp,*
  224 F.3d at 147 .............................................................................................................. 17

*HSBC v. Proseguay,*
  2004 U.S. Dist. LEXIS 19750 at 8- 12 ................................................... 12, 14, 15, 16

*Iragorri v. United Technologies Corp.,*
  274 F.3d 65, 72 (2d. Cir. 2001)............................................................................. 10, 11

*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.,*
  513 U.S. 527 (U.S. 1995)............................................................................................... 6

*Kloekner Reederei und Kohlenhandel v. A/S Hakedal,*
  210 F.2d 754 (2d Cir. 1954) ...................................................................................... 4, 6

*Lady Nelson, Ltd. v. Creole Petroleum Corp.,*
  286 F.2d 684 (2d Cir. 1960)........................................................................................... 3

*Man Ferrostaal, Inc. v. M/V Vertigo,*
  2006 U.S. Dist. LEXIS 62252 (S.D.N.Y. 2006) ......................................................... 12

*Piper Aircraft v. Reyno,*
  454 U.S. 235, 241, n.6 .................................................................................................. 17

*PT United Can Co. v. Crown Cork & Seal Co.,*
  138 F.3d 65, 74 (2d. Cir 1997)........................................................................... 8, 10, 15

*Robinson v. O.F. Shearer & Sons, Inc.*
  429 F.2d 83, 86 n.3 (3d. Cir, 1970).................................................................. 7

*Sea-Transport Contractors v. Industries Chemiques du Senegal,*
  411 F. Supp.2d 386, 388, 395 (S.D.N.Y. 2006)............................................. 17

*Sevison,*
  37 V.I. 231, [WL] at *6.................................................................................. 6

*Sharma v. Skaarup Ship Management Corp.,*
  699 F. Supp. 440, 448 (S.D.N.Y. 1988)........................................................ 5

*Swift & Company Packers v. Compania Colombiana Del Caribe, S.A.,*
  339 U.S. 684, 693 (1950).............................................................................. 7

*Szollosy v. Hyatt Corp.,*
  208 F. Supp. 2d 205, 211 n.4 (D. Conn. 2002)............................................. 5

*The Belgenland,*
  114 U.S. 335 (1885)................................................................................. 4, 11

*The Mandu,*
  102 F.2d 459, 462 (E.D.N.Y. 1939)................................................. 3, *passim*

*The OREGON,*
  158 U.S. 186, 197 (1895)............................................................................ 12

*Victory Carriers, Inc. v. Law,*
  404 U.S. 202, 206 n.2, 30 L. Ed. 2d 383, 92 S. Ct. 418 (1971)...................... 5

*Winter Storm v. TPI,*
  310 F.3d 263 at 268 (2d. Cir. 2002)....................................................... 8, 17

## Other Authorities

Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 33 (2d ed. 1975).............. 5

T. J. Schoenbaum, ADMIRALTY AND MARITIME LAW, vol. 2, § 14-9, p. 324
  (Westgroup 3d ed. 2001)................................................................. 1, *passim*

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Plaintiff Aracruz Trading (hereinafter "Plaintiff" or "Aracruz") in opposition to the motion by Defendant Japaul Oil and Maritime Services (hereinafter "Japaul") to dismiss the complaint. For the reasons outlined more fully below, the motion should be denied in its entirety, or, at a minimum, the funds under attachment should be maintained pending the outcome of the case in an alternative forum.

## RESPONSE ON THE FACTS

The facts relevant to the pending motion are, for the most part, not in dispute. Indeed, Plaintiff and Defendant concur that this action arises from a collision between the M/V STELLAR and Plaintiff's anchored vessel (i.e. the LPG/C GAS AMAZON) off Port Harcourt, Nigeria on February 19, 2008. The parties are also in agreement that at the time of the collision, the M/V STELLAR was a dead ship which was being towed by Defendant's tug the JAPAUL B.[1] Finally, there appears to be no dispute that Defendant is responsible for the collision and liable to the Plaintiff for the damages (or at least the Defendant has not asserted it is not). On this point, the law in virtually all maritime jurisdictions is the same in that the party in control of a moving vessel that strikes a stationary object or anchored vessel is presumptively responsible for the collision.

The only fact which appears to be "in dispute" relates to the position that the Defendant purportedly has no contacts with the United States. (*See* Esemitodje Affidavit

---

[1] Technically, this matter involves an allision rather than a collision because Defendant's tug, while towing a dead vessel, caused the dead vessel to strike the Plaintiff's anchored vessel. An "allision" is a collision between a moving vessel and a stationary object. See Thomas J. Schoenbaum, *ADMIRALTY AND MARITIME LAW*, vol. 2, § 14-2, p. 284, n.1 (Westgroup 3d ed. 2001). The distinction has no bearing on the issues relevant to the pending motion, however, and the terms are used interchangeably.

at ¶'s 5-6, stating that the Defendant has no connection with the United States.) In point of fact, Japaul has a subsidiary entity located in Maryland (i.e. Japaul LLC) which was formed for the specific purpose of providing technical support and training to Japaul's office and staff in Nigeria. (See Exhibit J to Carlson Declaration, newspaper article confirming the nature of the business of Japaul's Maryland subsidiary. (See also, Exhibits G and I to Carlson Declaration, which include the State of Maryland confirmation of corporate existence and the Articles of Organization for Japaul LLC, respectively). Japaul's subsidiary's Articles of Incorporation specifically note that the purpose of the creation of the subsidiary was also to facilitate the "purchase and sales of used and new trucks, traders, heavy duty equipment, ships and all sorts of marine equipment" which would obviously be utilized in respect to Japaul's maritime operations (See Exhibit I).

In a similar vein, Japaul's suggestion that it has no personnel in the United States and that suit here would be terribly inconvenient is a bit misleading, to say the least, given that it opted to create a wholly-owned subsidiary (i.e. Japaul LLC) here and maintains a dedicated authorized person (Mr. Olusula Oke) who resides in Maryland (See Exhibit G). Further, Mr. Paul Jegede, who is identified as the Managing Director of Japaul in Nigeria, is also identified in the Articles of Organization of Japaul's subsidiary as the "authorized person" for the subsidiary (See Exhibit I). As such, the suggestion that defending a suit here would put Japaul to extreme hardship rings hollow in view of its volunray election to create a subsidiary here.

Apart from inaccuracy of Defendant's portrayal of its contacts with the U.S., there are no other significant facts in dispute, and to the extent facts play a role in the

evaluation of the issues raised by this motion, they are treated in the argument section of this brief.

### POINT I

### THIS COURT HAS SUBJECT MATTER JURISDICTION
### BECAUSE THE SUIT ARISES FROM A
### COLLISION BETWEEN TWO VESSELS

In its motion to dismiss, Defendant mistakenly argues that this Court lacks subject matter jurisdiction simply because the collision occurred in Nigerian waters.  To the contrary, and as outlined by the Second Circuit in one of the leading cases on point, the "[r]etention of jurisdiction of a suit in admiralty between foreigners is within the discretion of the court of first instance."  *The Mandu*, 102 F.2d 459, 462 (E.D.N.Y. 1939).  Further, and as outlined by the noted commentator Schoenbaum in his treatise on Admiralty Law, "[i]n the United States collision jurisdiction potentially extends to the four corners of the globe, to the high seas and even foreign territorial waters." T. J. Schoenbaum, ADMIRALTY AND MARITIME LAW, vol. 2, § 14-9, p. 324 (Westgroup 3d ed. 2001); *see also Lady Nelson, Ltd. v. Creole Petroleum Corp.*, 286 F.2d 684 (2d Cir. 1960) (addressing damages resulting from collision between Canadian and Venezuelan vessels in Trinidadian waters.)

*The Mandu* involved a collision between two vessels – one Brazilian, one German – which occurred in Brazilian territorial waters. The parties to the action were foreign, and the case was dismissed at the district court level.  On appeal, the appellee sought to support dismissal on grounds of a lack of subject matter jurisdiction since all parties were foreign, which was rejected by the Second Circuit. The Court based its decision to retain jurisdiction on a variety of factors including the fact that the parties lacked a common

jurisdiction in which to bring their case. *The Mandu*, 102 F.2d at 462. Further, no agreement had been made regarding litigation in a particular country. *Id.* In its discussion of why it was appropriate to retain jurisdiction, the Second Circuit noted that "under these conditions it would have been unusual to have declined jurisdiction even at an early stage" and indicated that a district court does indeed have jurisdiction under these circumstances subject to an exercise of its discretion (which is treated more fully below in POINT III).

The collision before the Court is analogous to *The Mandu* in that it involves a Nigerian Defendant who towed a dead ship into an anchored vessel owned by the Plaintiff (a Marshall Islands corporation), while the vessels were in Nigerian waters. As in *The Mandu,* there is no agreement here as to where the litigation regarding the damages should be entertained, and the suit is between two foreign parties who lack a common situs for the adjudication of this dispute.

Numerous other courts have reached the same conclusion with respect to subject matter jurisdiction in cases involving collisions between vessels owned by foreigners outside the United States. *See The Belgenland*, 114 U.S. 355 (1885) (noting that existence of jurisdiction in all such cases involving collisions on the high seas between foreigners is beyond dispute, with the only question for determination being whether it is expedient for the court to retain jurisdiction under the particular facts); *Kloekner Reederei und Kohlenhandel v. A/S Hakedal*, 210 F.2d 754 (2d Cir. 1954) (an alien plaintiff has the privilege of suing an alien defendant on a claim relating to a collision outside the US wherever he can serve or attach his property, subject to the defendant showing he should be able to avoid the suit because he will be unfairly prejudiced unless it be removed to

some other jurisdiction); *Exter Shipping, Ltd. v. Kilakos*, 310 F. Supp. 2d 1301 (N.D. Ga. 2004) (maritime jurisdiction exists over torts occurring in the navigable waters of other nations); *Szollosy v. Hyatt Corp.*, 208 F. Supp. 2d 205, 211 n.4 (D. Conn. 2002) (recognizing split in authority but exercising admiralty jurisdiction over jet ski accident in Cayman Islands waters); *Afflerbach v. Cunard Line, Ltd.*, 14 F. Supp. 2d 1260, 1263 n. 1 (D. Wyo. 1998) (assuming admiralty jurisdiction over passenger disembarkation injury at Cayman Islands); *Sevison*, 37 V.I. 231, [WL] at *6 (holding injury suffered on sailboat docked in St. Kitts subject to admiralty jurisdiction); *see also*, Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 33 (2d ed. 1975) ("Occurrences on foreign navigable waters may also ground admiralty jurisdiction.

In support of its position that the Court lacks admiralty jurisdiction, Defendant Japaul cites only two cases.  In the first, *Sharma v. Skaarup Ship Management Corp.*, 699 F. Supp. 440, 448 (S.D.N.Y. 1988), the court indicated that it had no admiralty jurisdiction over a claim for wrongful arrest in Canada.  The case is distinguishable on the facts and the grounds for denial of jurisdiction are questionable.  In *Sharma*, the district court relied primarily on dicta in *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 206 n.2 (1971), for the proposition that federal maritime jurisdiction extends only to torts occurring on the "high seas or navigable waters."  The issue in *Victory Carriers* did not involve an assessment of high seas jurisdiction versus foreign territorial water jurisdiction, but rather whether Alabama law or federal maritime law governed an injury to a worker on a pier while driving cargo to a ship.  The dicta in *Victory Carriers* relied upon by the *Sharma* Court was merely an outline of the traditional situs test for maritime tort jurisdiction – that is, whether the tort occurred on navigable water and if so, federal

maritime law applied. There is no indication that the *Victory Carriers* Court was intentionally distinguishing torts in United States waters from torts in territorial waters of foreign nations. As such, the *Sharma* holding is questionable, at best, and flies in the face of the Second Circuit's clear indication in *The MANDU* that jurisdiction does indeed lie in such a fact pattern involving a collision outside the U.S., including foreign territorial waters.

The other decision cited by Defendant Japaul, *Jerome B. Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (U.S. 1995), has no bearing on the case at bar whatsoever. It involved an incident on the Chicago River and a discussion about the two-part test for admiralty tort jurisdiction in the context of that particular fact pattern – land-based injuries flowing from pile driving on navigable waters. It has absolutely nothing whatsoever to do with our situation.

The clear weight of authority supports admiralty jurisdiction in the context of a collision notwithstanding that it may have occurred outside the US and is between foreigners. As noted by the *Klockner* Court, although courts will use their discretion in determining whether to retain such a case, because such controversies are "communis juris" - that is, where they arise under the common maritime law of seafaring nations, some special grounds should appear before the court "den[ies] its aid to a foreign suitor when it has jurisdiction of the ship or party charged", as is the case here by virtue of the attachment. For the reasons discussed herein, there are no special grounds. (*See* Point III, discussing opposition to FNC application).

**POINT II**

**THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT BECAUSE THE RULE B ATTACHMENT SEIZED PROPERTY OF THE DEFENDANT AND THUS THE COURT HAS *QUASI-IN-REM* JURISDICTION OVER THE DEFENDANT TO THE EXTENT OF THAT PROPERTY.**

Defendant next contends that this Court lacks personal jurisdiction over it under New York law because it lacks sufficient contact with New York State. The argument ignores the Rule B attachment, and is misplaced.

Plaintiff's action here is in respect to a maritime claim in which *in personam* jurisdiction is based on the *quasi-in-rem* seizure of the Defendant's funds under Rule B. A Rule B attachment is a *quasi-in-rem* mechanism which compels the personal appearance of a non-resident defendant to answer and defend a suit brought against him via the seizure of his property in the district. T. J. Schoenbaum, ADMIRALTY AND MARITIME LAW, vol. 2, § 21-2, p. 505-06 (maritime attachment presupposes an *in personam* claim, and Rule B allows the plaintiff to assert personal jurisdiction over a defendant who cannot be found through attachment of her property or garnishment of a debt owed to her). It is a distinctive admiralty remedy that was a part of American jurisprudence at the time the Constitution was adopted. *Id.* at 507.

Maritime attachment serves two purposes, both of which are at issue in this case: to secure respondent's appearance and to secure satisfaction in case a lawsuit is successful. *Robinson v. O.F. Shearer & Sons, Inc.* 429 F.2d 83, 86 n.3 (3d. Cir, 1970), citing *Swift & Company Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950).

Here, Japaul does not contend that the attachment was improper, that it could be found, or that the property seized was not its property. As such, its argument (that it is not found in the Southern District), in essence, confirms the validity of the attachment because it is the absence of a defendant's presence in the district that allows the attachment to issue in the first place. *See also Winter Storm Shipping, Ltd. v TPI*, 310 F.3d 263 (2d Cir. 2002), for discussion of the nature of the remedy, the grounds upon which an attachment can issue and the result of a successful seizure of property. The attachment of Japaul's property serves as security for Plaintiff's lawsuit and establishes *in personam* jurisdiction over the defendant to the extent property is restrained. In the context of the assertion of *quasi in rem* jurisdiction under Rule B, the question of personal jurisdiction is irrelevant where property is in fact seized. In this action, funds in the full amount of the security sought have been restrained and thus Defendant is present before the Court to the extent of that property.

## POINT III

### DISMISSAL ON *FNC* GROUNDS IS NOT WARRANTED BECAUSE DEFENDANT CANNOT PROVE NIGERIA IS AN ADEQUATE FORUM DUE TO THE LEVEL OF VIOLENCE THERE, AND NEITHER THE PUBLIC NOR PRIVATE INTEREST FACTORS TIP THE BALANCE IN FAVOR OF LITIGATION IN NIGERIA

Defendant next argues that the Court should dismiss the action on *forum non conveniens* grounds in favor of litigation in Nigeria. For the reasons set forth below, that application should be denied.

At the outset, the Defendant ignores the fact that even a foreign plaintiff's choice of forum warrants some deference. *PT United Can Company Ltd. v. Crown Cork and Seal Company Ltd.*, 197 U.S. Dist. LEXIS 692, 19 (S.D.N.Y. 1997). Further, Japaul

essentially sidesteps the fact that as the movant, it must shoulder the burden of proof that

adjudication elsewhere is appropriate under the established criteria for evaluation of an

*FNC* application, which it cannot do in the circumstances of this case.

## A.    **Applicable Legal Standard**

In its review of an application for dismissal on *forum non conveniens* grounds, the

court applies a three-step test which includes a review of the following factors:

(i)    an initial determination of the degree of deference to be afforded to the plaintiff's choice of forum;

(ii)    an examination of whether an alternative adequate forum exists; and

(iii)    whether a balancing of the public and private interest factors enumerated by the Supreme Court in *Gulf Oil* and *Piper* tip the scale in favor of the Defendant.

Each is addressed in detail below.

### (i)    **Deference to the Plaintiff's Choice of Forum**

Turning first to the initial factor involving the degree of deference, it is generally

considered that unless the balance of all the other factors tips "strongly in favor of the

defendant, the plaintiff's choice of forum should rarely be disturbed." *Concesionaria*

*DHM v. International Finance Corporation*, 307 F.Supp. 2d 553, 562 (S.D.N.Y. 2004),

(citing *Gulf Oil*, 330 U.S. at 508). While admittedly in an action filed by a foreign

plaintiff (as compared to a domestic plaintiff) a lower degree of deference is generally

afforded, the Second Circuit nonetheless applies a sliding scale approach to this initial

determination of the degree of deference to be afforded all plaintiffs' selection of the

forum. In this respect, it is submitted therefore that even a foreign defendant is entitled to

a measurable degree of deference where there are "valid" reasons for its selection of the

forum. *See generally Concesionaria* and *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d. Cir. 2001).

By way of illustration, valid reasons to maintain an action in the face of an *FNC* application include, *inter alia,* the relative convenience of the parties, the availability of appropriate legal assistance and the defendant's amenability to suit in the forum. By contrast, invalid reasons for choice of forum may include forum-shopping for generous juries and the popularity or unpopularity of the parties in the selected forum. *Id.* For the reasons set forth below, Plaintiff Aracruz submits that it should be afforded a reasonable degree of deference because it has "valid reasons" for having commenced the action here.

First, the plaintiff seeks no advantage by having filed here because as a foreigner, it enjoys no home court advantage. The same can be said for the defendant, and thus both parties come before this Court on equal footing. Also, and to be fair, it is the defendant who seeks the hometown advantage by transferring the action to Nigeria, its base of operations.

Next, the plaintiff certainly did not file in New York to seek the benefits of the "habitual generosity" of American juries. *Iragorri* at 72. This is an admiralty case which is tried to the Court without a jury. F.R.C.P. 9(h).

Further, the defendant is amenable to suit here by virtue of the *quasi in rem* seizure of property because it routinely trades in dollars which move through the New York banking system. Indeed, by all accounts, there are only two jurisdictions in the world where this suit could be tried, New York (by virtue of the attachment) and Nigeria, the defendant's home forum. Plaintiff is present in neither forum and Defendant is present in both. Moreover, defendant's argument regarding inconvenience is little more

than a fabrication when one considers that it purposefully created a subsidiary 220 miles down Interstate 95.[2]

Last, but not least, the fact that the collision occurred in Nigerian waters is really the only connection with that jurisdiction. Despite the defendant's reference to some police investigation, plaintiff is unaware of any such investigation and was never contacted by any Nigerian authority (maritime or civil) regarding the incident. (See Stockley Declaration at ¶ 43). Defendant claims that it will need to secure "testimony" from investigating officers of the Nigerian Police, yet provides a copy of no report and no investigation was conducted with the plaintiff.

The narrow legal issues to be addressed in this case, combined with the clear burden placed on Defendant under both Nigerian and United States law, enables this court to provide adequate legal assistance. The concerns mentioned by the Second Circuit in *Iragorri* – namely forum shopping for generous juries or an effort to secure a hometown advantage – are simply not present. Instead, and given the above-referenced "valid" reasons, the Court should give deference to Plaintiff's choice of forum, notwithstanding the fact that it is foreign. Moreover, the courts of seafaring nations are historically more flexible in opening their doors to cases involving collisions between foreign vessels. *See e.g., The Belgenland*, 114 U.S. 335 (1885) (adjudication of a

---

[2]    As outlined above, defendant's submissions exclude any reference to its U.S. subsidiary. Defendant's counsel states that "defendant does not conduct any business in the United States, and all its employees reside in Nigeria." (See Defendant's Memo at 2). Defendant's Company Secretary/Legal Officer states in a sworn affidavit "[t]hat the defendant corporation is duly registered to do business in the Nigeria without any presence in the United States." (See Olaronke Esemitodje, Affidavit in Support, p. 1, para. 4). Yet Defendant established a registered limited liability corporation in Cheverly, Maryland, whose operations, according to Japaul's Managing Director Paul Jegede, "shall be tailored towards giving technical support to the Nigerian company and shall be a training ground for the employees of [the] great company." (See Exhibit J). Jegede's statements to the Nigerian press.

collision on the high seas between two foreign vessels); *Man Ferrostaal, Inc. v. M/V Vertigo*, 2006 U.S. Dist. LEXIS 62252 (S.D.N.Y. 2006) (adjudication of a collision between a Jamaican-flagged vessel and a Liberian-flagged vessel in Danish waters). The law of this forum mirrors the law of the site of the accident.[3]  Plaintiff seeks only a fair opportunity to adjudicate its case in a forum where the defendant is present and no undue advantage will be afforded either party.  Under the sliding scale applied in *Iragorri*, the selection of the Southern District should not be disturbed.

      (ii)    **Nigeria is not an Adequate, Alternative Forum.**

As outlined above, it is the defendant that is charged with the burden of demonstrating that its proposed alternative forum is adequate.  *Concesionaria DHM*, 307 F.Supp. 2d at 563.  In determining adequacy, courts may consider the safety of litigants. *See HSBC. v. Prosegur*, 2004 U.S. Dist. LEXIS 19750 at 8-12, and *BFI Group Divino Corp. v. JSC Russian Aluminum*, 481 F. Supp. 2d 274, 284 ("courts may, of course, properly consider the safety of litigants when ruling on a motion to dismiss for *forum non conveniens*.")

Defendant argues that Nigeria provides an adequate alternative forum because the Federal High Court there is vested with admiralty jurisdiction.  While this may in fact be the case, the inquiry does not end there, and defendant makes no mention of the rampant violence and danger to which foreigners are exposed in travel to that jurisdiction.

At the outset, while plaintiff recognizes that general statements regarding instability may not suffice to establish a forum as too dangerous to be adequate, the

---

[3]   See Exhibit L, Akinrele Declaration confirming similarity of Nigerian maritime law on the presumptions in an allision situation.  See also, *The OREGON*, 158 U.S. 186, 197 (1895), confirming US law with respect to an allision between a moving vessel and a vessel at anchor is the same.

dangerous nature of the conditions at Port Harcourt are so well known as to bring this case within those decisions where the "level of gravity [was such that] . . . the courts within this circuit have spared parties from returning to a threatening forum." *Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. Appx. 47, 50 (2d. Cir. 2004).

Port Harcourt presents such a level of gravity. In *BFI Group Divino Corp. v. JSC Russian Aluminum*, the court recognized the Niger River Delta, where Port Harcourt is located, "as the most unstable part of the country" with a former president of Nigeria calling the Niger Delta region "the biggest problem Nigeria faces today." 247 F.R.D. 427, 431 n. 6 (S.D.N.Y. 2007). The United States Department of State strongly advises against travel to Rivers State, where Port Harcourt is located, "because of the very high risk of kidnapping, robbery, and other armed attacks in these areas." See Travel Warning, United States Department of State, Bureau of Consular Affairs, updated September 2, 2008, at http://travel.state.gov/travel/cis_pa_tw/tw/tw_928.html.

The collision at the center of this controversy occurred in an area located in the Niger River Delta steeped in violence. Indeed, after the collision, the plaintiff's surveyor was unable to even attend the vessel to assess the damage due to the fact that there had just occurred the murder of the launch captain by armed gangs. (See Stockley Declaration, ¶ 24). It is a fact of life in Nigeria that kidnapping for ransom is not only a business but a booming business in the Niger River Delta and "increasingly hostages have been taken by gangs of gunmen seeking ransoms." *See* Alex Last, *Nigeria's Oil Workers Under Siege*, BBC News, February 21, 2007, http://news.bbc.co.uk/2/hi/africa/6382219.stm. Violence continues unabated in the area. (See Exhibit E, Chronology of recent Nigerian militants' attacks).

Finally, and perhaps most compellingly, the plaintiff cannot by law bring its witnesses into Nigeria for purposes of this case. As outlined in the Stockley Declaration, the three principal witnesses to the incident (i.e. the officers of the LPG/C GAS AMAZON) are all Filipino nationals who are banned by order of the Filipino government from working in any capacity in Nigeria. The conditions to which Filipinos have been exposed have become so extreme that a Decree was issued by the Philippines Department of Labor and Employment explicitly forbidding any travel by a Filipino into Nigeria and the plaintiff would not, and cannot in any capacity, compel them to go there for the purpose of this case. (*See* Stockley Declaration at ¶¶36-38 for a more thorough discussion of this prohibition and the Philippines' Governmental Decree).

Courts in this circuit have also recognized corruption as a factor in determining the adequacy of an alternative forum as well as Nigeria's corruption. In *HSBC v. Proseguay*, the court found that corruption in Paraguay mitigated against any assertions of its adequacy. 2004 U.S. Dist. LEXIS 19750 at 10. In doing so, the court cited the country's fourth-place ranking on the list of most corrupt countries, two-spaces behind second-place Nigeria.

Threats of violence, corruption, political instability, kidnappings, and governmental decrees prohibiting Filipino witnesses from traveling to Nigeria to work certainly rise to the "level of gravity" at which this Court should spare the plaintiff from having to return to that jurisdiction to adjudicate its claim. *See HSBC* and *Guidi v. Inter-Continental Hotels Corp*, 224 F.3d at 147 (where the court, in the context of its evaluation of the "private" interest factor, found that concerns regarding foreigners being the target of hostile attacks a legitimate element in an *FNC* evaluation.)

Taking all the foregoing into account, Nigeria is not an adequate alternative forum for the adjudication of this dispute, and the defendant has not and cannot carry its burden merely by pointing to the fact that Nigeria has an admiralty court.

**(iii)    Public/Private Interest Analysis**

Even if the Court was to determine that the defendant had carried its burden of establishing that suit in Port Harcourt was an alternative, adequate forum, the defendant still bears the burden of showing that the balance of the private and public factors tips strongly in favor of suit in Nigeria. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d. Cir 1997).  Defendant cannot do so here because application of the *Piper Aircraft v. Reyno*, 454 U.S. 235, 241, n.6, factors to the facts of this case does not tip the balance in favor of Nigeria.

In *Piper*, the Supreme Court outlined that the court's review of the public interest factors should include an analysis of 1) the administrative difficulties flowing from court congestion, 2) the local interest in having local controversies decided at home, 3) the interest in having the trial of a diversity case in a forum that is home with the law that must govern the action; 4) the avoidance of unnecessary problems in conflict of laws; and 5) the unfairness of burdening citizens of an unrelated forum with jury duty.

In regards to congestion under public interest factor (1), the Second Circuit has "made clear that this consideration is not relevant within the Second Circuit so long as all judicial vacancies are filled." *HSBC*, 2004 U.S. Dist. LEXIS 19750, 6 n.1.  As for factors (3) and (5), they are irrelevant because this is an action under the court's admiralty jurisdiction which is tried non-jury and this is not a diversity case.  With respect to factor (2), while this is admittedly not a local controversy *per se*, as noted above, the courts of

seafaring nations have always exhibited a tradition of opening their doors to foreign litigants in case involving collisions and the law of Nigeria in respect to this collision is the same as US law.

Moving on to the private interest factors, a legitimate analysis again does not tip the scale in favor of Nigeria. The factors include: (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) possibility of viewing the premises, if they would be appropriate to action; (4) and all other practical problems which make trial of a case easy, expeditious and inexpensive.

Relative ease of access to sources of proof is not an issue as the case involves few documents and few witnesses. In fact, this is primarily a damages case given the presumption of negligence which exists. The only documents of any real relevance will be the repair records which are in Spain (where the vessel was repaired) and without which the plaintiff will not be able to prove its case so there is no issue with respect to compulsory production of evidence. As for costs, "courts generally refuse to dismiss cases where the cost burden would simply shift from one party to another." *HSBC*, 2004 U.S. Dist. LEXIS 19750, at 12. Neither parties' witnesses is located in New York and both parties will bear equal costs to adjudicate the matter here. Adjudicating the matter in Nigeria would burden only the plaintiff and not the defendant, and given the defendant's reluctance to disclose its presence in the US, its claim to financial hardship rings hollow. The viewing of the premises is not an issue, as the vessel has already been repaired and is currently at sea and there would be nothing to view as it would be impossible to reconstruct the scene since both vessels left the site of the accident long

ago. Finally, and with respect to defendant's contention that it will not be possible to procure witnesses, there is no ban on travel to the United States from Nigeria (See Carlson Declaration), and at best, the defendant would have only one witness even if it wanted to try to contest liability, its tug captain who is in its employ.

In view of the foregoing, and with a balanced and fair evaluation of the *FNC* factors in the context of this collision case, the defendant has not carried its burden and the application should be denied. New York is the only fair place where this case can be tried.

### POINT IV

### IN NO EVENT SHOULD THE FUNDS UNDER ATTACHMENT BE RELEASED EVEN IF THE COURT WAS TO GRANT THE *FNC* APPLICATION BECAUSE A RULE B ATTACHMENT SERVES IN AID OF FOREIGN LITIGATION

Rule B attachments assist in the aid of foreign litigation by providing security for claims before foreign courts. In *Sea-Transport Contractors v. Industries Chemiques du Senegal*, the court denied defendant's motion to vacate the attachment used as security for a maritime arbitration claim in London. 411 F. Supp.2d 386, 388 (S.D.N.Y. 2006). The *Sea-Transport* court stated that a maritime attachment is available whenever the plaintiff has an *in personam* claim against the defendant that is cognizable in admiralty. *Id.* at 395 (citing *Winter Storm v. TPI,* 310 F.3d 263 at 268 (2d. Cir. 2002)). The court further stated:

> there is no nationality-based jurisdictional limitation in this Court's admiralty purview and, inasmuch, Rule B seizures of EFTs have since 2002 been available to "every foreign litigant" with a claim or currently

in foreign arbitration. *Sea-Transport Contractors*, 411 F. Supp. 2d at 395.[4]

   As such, and even if this Court was to grant Defendant's motion to dismiss based on the grounds of *forum non conveniens* (which plaintiff submits it should not), the attachment should nevertheless be maintained and the funds held as security for enforcement of the outcome of the litigation. Those funds are crucial to the plaintiff's ability to secure redress for the negligent actions of Japaul and absent that security, there is a very real risk that any litigation in Nigeria would produce little more than a Pyrrhic victory.

   In this respect, and as amplification of the "adequacy" discussion above, it is a fact that judges in Nigeria "frequently [fail] to appear for trials, often because they [are] pursuing other source of income, and sometimes because of threats against them. In addition, court officials often lacked the proper equipment, training, and motivation to perform their duties, primarily due to inadequate compensation." See U.S. Department of State, Country Reports on Human Rights Practices - 2005, March 8, 2006, available at http://www.state.gov/g/drl/rls/hrrpt/2005/61586.htm. In view of this, vacatur of the security would provide an incentive for Japaul to allow the case to languish in what is clearly an inefficient judicial system.

   Based on the clear authority in *Sea-Transport* and the cases cited therein, and the risks attendant to a vacatur of the security in connection with a case which the defendant seeks to transfer to Nigeria, the plaintiff respectfully submits that under no circumstances

---

[4] In *Sea Transport*, the court cited with approval those previous cases which upheld an attachment in aid of foreign litigation (as opposed to arbitration).

should the attachment be vacated but rather the funds placed into an interest-bearing account with the clerk of the court pending adjudication elsewhere.

## CONCLUSION

For the reasons set forth above, the motion by the defendant to dismiss should be denied in its entirety.

Dated: New York, New York
       September 3, 2008

                              FREEHILL HOGAN & MAHAR LLP
                              Attorneys for Plaintiff
                              ARACRUZ TRADING LTD.

                              By: _____
                                  Peter J. Gutowski (PG 2200)
                                  80 Pine Street
                                  New York, NY  10005
                                  T: (212) 425-1900
                                  F: (212) 425-1901

To:    Philip Akakwam, Esq.
       Attorneys for Defendant
       303 Livingston Street, 2Fl
       Brooklyn, New York 11217